Good morning. My name is Howard Katzhoff. I represent Jesse Young. The first argument that I'm addressing is on Jesse Young's 404B claims. Jesse Young argues that the district court erred in admitting 404B evidence. The 404B evidence was evidence of a prior similar conviction for drug trafficking and heroin arising out of a police stop of his vehicle about six or seven years prior to the trial date. I believe the quantity of issue in that matter was 198 grams. He objected to the admission of the evidence and submits that the court erred in admitting it. In particular, I want to address the 403 balancing, which I submit and argue that the case is similar to Linares in that this is not a classic quit or possession case, which have been distinguished in Douglas and Pettiford and Cassell and other cases in terms of how the 404B applies to a possession case. Here, the evidence was mostly from a cooperating witness of his direct involvement in specific incidents similar to Linares. My point in the argument... Jesse Young Linares specifically distinguished cases such as Crowder, which had been a quit case. We explained all this in Douglas, as you're aware, I'm sure, in pretty great detail about why Linares was cabined, I would use that word. I think it was a different beast or whatever the term is because of the facts in that case involving the use of the gun and the witnesses. My point is that it was argued that it wasn't, even though intent and knowledge are formal issues in the case, they were very weak in this case to the point that they were very weak grounds for admission. Can you say more about that specifically? What is the evidence? Why is knowledge weak? One of the things that strikes me about the 404B evidence here is that the prior is possession was intended to distribute and the sole charge that went to trial against your client here was conspiracy. There's a difference there. Can you be a little bit more specific about what you think? They both involved heroin. They both involved allegations of wholesale quantity of heroin. My main point is that when evidence is used for intent and knowledge that there's an inherent risk of prejudice in those cases that have been recognized in a number of cases. Is that a 403 point? A 403 point. Why are you jumping ahead to 403? I'm just kidding. I know that you feel like you have a 403 argument and I don't want to keep you from making the argument that you think is the best, but you had made the argument in your briefs about the threshold question under 404B based on Linares and is it that you read our decisions as largely foreclosing that line of argument? You know, I don't think that Linares forecloses it for the reasons that I started to give even though it's pigeonholed because of the nature of the evidence. The cooperating witness in this case says he met with my client, Jesse Young, that Jesse Young provided heroin on these series of trips to New York. So there's just direct evidence. There's not constructive possession. There's not personal use. There's not possession of some unknown substance. There's none of those kinds of issues raised that are raised in many of the other kinds of cases. So I thought the threshold issue was still there and very close to Linares. But being close, and I laid that out in my brief, I wanted to focus more on the inherent risk of prejudice when it's admitted for intent and knowledge. Absence of mistake really wasn't an issue here. So the three things the judge instructed on, the final instruction, is knowledge, intent, and absence of mistake. And the bottom line, as has been recognized, the permissible inference when 404B evidence is used to establish intent is very, very close to the impermissible inference. And that is that if you did it before, he's likely to do it again. And the cases that out-of-circuit Miller, Lee, and Haywood were drug cases that went into that analysis and recognized the inherent dangers and risks of prejudice that exist when it's used for intent. So in a case where it's not otherwise a very material issue in the case, my argument is that... But that's really inconsistent with Douglas, isn't it? Well, Douglas was... And Pettyford. Those are cases post-Linares that really tried to explain Crowder on the one hand and Linares on the other. And for all those things went over. Well, Linares was just possession. It was not a specific intent crime. As I read those, I draw the distinction to be possession with intent to distribute. And the discussion being that where there is constructive possession cases, and generally in search warrant cases, search of car cases, where it's constructive possession, one of the ways to prove it is knowing possession or knowledge, the knowledge element. And we generally just don't have that here because it doesn't have those kind of facts. And dominion and control. So either actual possession or actual commission of an act that constitutes a crime, or we have constructive possession. And the Douglas, Pettyford, Cassell lines of cases really deal oftentimes with the constructive possession notions of knowledge and intent. So we have a different... When it's intent to join the conspiracy, intent to distribute the drugs, which is what we had throughout this case, it's a different issue. And it doesn't really... I don't think Douglas or Pettyford or Cassell control this case and the facts in this case. That's why I say Linares is closer. But on the 403 analysis, because it's being used for intent, and permissible purposes are so close, it really was very prejudicial. Not harmless in this case. Well, it's prejudicial. It's supposed to be prejudicial, right? It's supposed to be. So how do we distinguish the impermissible amount of prejudice? Well, that's the hard part, the unfair or the undue prejudice. The unfair. Because obviously if it wasn't... If it didn't have some impact on the jury, we wouldn't call it prejudice. Right. But the cases seem to suggest where the only issue is intent in these kinds of offenses, that the prejudice is unfair and undue. Because as they pose the question in Miller and Lee, how exactly does that prior conviction go to show the intent in this incident except for propensity? And it's just such a fine line that in these kind of cases, as to the error, I just would submit that in closing argument, there was a great deal of problems and holes poked. And I would submit that without the 404B, they would have been given greater weight by a jury. And it's the government's burden to prove there was not prejudice. And I don't think they can satisfy that here. Okay. Well, we're going to do this issue by issue, as you all know. So we'll give you rebuttal as the government on this issue. And then we'll do it that way for each succeeding issue as well. Thank you. Here from the government. Thank you, Your Honor. I'm Sue Latesse here for the United States. Judge Howard did not abuse her discretion when applying Pettiford and Douglas. She found that the prior drug convictions were relevant to prove knowledge and intent to join the charge conspiracy, which was a conspiracy to possess with intent to distribute heroin. And that's a specific intent crime. So you said both knowledge and intent. You don't have a theory of knowledge in your brief, as far as I could tell? That the evidence was relevant to knowledge? That's correct, Your Honor. In the brief, it relied primarily on intent because the defendant's reliance on Linares and because of this court's precedent, distinguishing Linares particularly on the intent ground. Well, what could be? There is no knowledge theory, as far as I can tell. Is there an open issue as to knowledge as to which this evidence would have closed the loop? I didn't understand that. I thought your argument was that the reason this evidence was germane was because it went to intent. As for Saxton in particular, he... Oh, I'm sorry. I'm talking about Jesse. I'm sorry. Yeah, I'm sorry. Thank you for the clarification. Yeah, if you're just talking about Jesse, who the evidence at trial was from McDuffie, and McDuffie says Jesse sold to two other people to then resell. As to that, there's no question about knowledge. As far as I can tell, your theory was that that evidence comes in because it somehow goes to intent. As to Jesse, it goes primarily to intent. You say primarily, because it must go to knowledge to show that he knew the substance was what the substance was, right? Or knowledge that his co-conspirators were doing what they said that they were going to do, which is distributing the drugs in question. Now, how would the prior... That's what I don't understand, and I'd love you to walk us through a little bit more concretely what the inference is that the jury's supposed to draw. Because the prior doesn't involve conspiracy. It involves possession of intent to distribute. And the question is, how does that go to the disputed issue in this case, as to Jesse, which is whether he, in selling to McDuffie and Faxton, had an intent to enter into a conspiracy with them for further distribution. I don't see how the prior has really any logical relationship to his intent to conspire here. Well, it was a conspiracy, but it was a conspiracy to commit the same substantive offense for which Jesse had previously been convicted. And the government was required to prove that Jesse knew that when he was providing the drugs to... The conspiracy that was charged when he was providing the drugs to Faxton and McDuffie, that they were taking the drugs back down to D.C. in order to distribute them. And how does his own direct... If you will, I guess one could ask how Jesse's own possession of intent to distribute, which, I guess crudely put, is a kind of a retail offense, would show that he intended in selling in this later time to be more of a wholesale. So if you're telling me as a juror what inference should I draw from this prior that's relevant to the conspiracy I need to find here, just tell me what you want me to draw on. I would point you to the inference that the government pointed out in the closing argument, which is that, quote, not everyone knows how to sell drugs, where to get them, how to cut and package drugs, what the price of drugs are. And that the prior crimes evidence makes it, quote, more likely that they knew how to sell drugs, that they knew what they were doing, and that they knew they were participating in a heroin conspiracy. And so the fact that Jesse knew about heroin distribution makes it more likely that he knew that what he was doing was engaging in heroin distribution and not simply... You thought the disputed issue was with him? I mean, there was physical evidence of drugs, there was... I thought the disputed issue had to do with whether what Jesse was doing was a conspiracy, not whether it involved heroin or whether he knew where to get heroin, but did it involve a conspiracy with those customers? In other words, was he engaged, as some of the cases put it, did he have an interest in the resale? Did he do things, I mean, like extend credit, or that would be relevant to whether there's a disputed conspiracy, because he wants, you know, the whole business to succeed. But I guess I'm not seeing how it goes to the disputed conspiracy intent. Well, certainly I think there are two things in that question. One is, was there other evidence of Jesse's participation in the conspiracy? And there certainly was other evidence of his participation in the conspiracy. But this court made clear in Douglas that you don't combine the relevance and 403 analysis. There's a threshold question of relevance. And that's simply whether or not it was relevant to prove some issue in the case and hear the specific intent to join a conspiracy that had at its heart a specific... a conspiracy to engage in a specific intent crime. And then the second question... And what that intent is, can you just spell out? The possession with intent to distribute the drugs, and the intent to distribute the drugs. So if it's just possession with intent to distribute, then the evidence that you had was that McDuffie says Jesse sold drugs, right, to us. And so what is the theory under which you were vulnerable on intent if somebody, if the jury believed McDuffie's testimony? But the question isn't whether or not the government was vulnerable on intent. Again, this is the 404B question. It's simply a threshold question. Was it relevant to prove something other than intent? Right, but in Linares, I think we did look at whether the evidence could be relevant. In other words, is there a theory under which there was a vulnerability as to the element to which the evidence went? That was the whole point of Linares, I think. And this court has been careful to distinguish Linares from the very specific facts of the case, which is that no one could reasonably say that, no one could reasonably believe the witnesses that the defendant in Linares had a gun in his hand, and yet believe that he didn't normally possess a gun. Whereas here, a witness, the jury could plausibly believe that, believe Mr. McDuffie's testimony that the drugs were provided to him by Jesse, but not necessarily believe that Jesse intended that those drugs be distributed in that way. And then the question is, how does a prior possession of intent to distribute by Jesse aid a juror in finding that this was not just Jesse doing what he'd previously been convicted of, which is retail sale, but actually something different, that he was conspiring with them for their further sale. I don't, I guess I'm still looking to you for more description of how that inference is bolstered by the evidence. And I would again point you to the careful argument at closing that the fact that Jesse had before sold, engaged in the distribution of drugs means that he understands, for example, what drug quantities are likely to be sold, as opposed to for personal use. If he had never sold heroin before, he might not know that 60 grams is actually a drug distribution quantity as opposed to a personal use quantity. And so if he had never distributed drugs before, he might plausibly have believed that he was giving the drugs to Faxon and McDuffie for their own personal use. Go ahead. But the fact that he had engaged in drug distribution before makes him know that the quantities and the regularity with which he was providing the drugs were drug distribution amounts. And therefore, that he should reasonably have expected that these drugs were being distributed in the Washington, D.C. area. Do you think, more broadly, that the theory of Linares, not the result, the theory of Linares, the judgment of Asim mentioned, is consistent with the theory of Crowder and Douglas and Pettiford? I think that courts have started, the Seventh Circuit in particular, have started to distinguish 404B evidence when it comes in in cases where specific intent or the intent of the defendant is not put at issue. And I think Linares could arguably fall within that class of cases where intent is not at issue.  in the en banc decision in Gomez, was very careful to distinguish between cases where there's just no question as to intent. And those are not very many cases. It's a small number of cases where intent is just not an issue. Judge Garland had a serious question about the consistency of Linares with Crowder. He didn't join Linares for exactly that reason. That's correct. And I think those are the cases where the courts have found that intent is not an issue at all. Those are a very small number of cases. You're being very careful, and that's understandable. But I think Judge Garland then wrote Pettiford, which comes later, and what he said is, in distinguishing Linares, and this is at the bottom of 589, but this is not a case in which the jury had to either believe the witnesses and conclude that the defendant knowingly possessed the crack with intent to distribute it, or disbelieve them and find that he did not possess the crack at all. And that passage to me suggests that there's no ironclad distinction between Linares and a specific intent situation such that Linares is just taken off the table. It applies Linares to the context of possession with intent to distribute and asks about the particulars of the case and says, is this a case in which the only evidentiary possibility is that the person either possessed with intent to distribute or didn't possess it at all? If that's the distinction with Linares, then this case is distinguishable from Linares because, as I mentioned before, this is a case in which one could believe, for example, that Jesse had provided the drugs to Baxton and McDuffie without knowing that they were going to be distributed. To redistribute, right. Exactly, to redistribute them. Yeah, and that's an interesting argument. Can I ask you one question about this because I'm not exactly sure what to do with this, which is that if the theory under which the evidence comes in is that it goes to whether Jesse had the requisite intent with respect to the redistribution by McDuffie and Baxton, then what do we do with the fact, for example, that when the judge gives the limiting instruction, the limiting instruction has nothing to do with that theory at all? So I'm looking at J28 to J29. And at that point, we can get to the closing instruction later, but at that point what the jury is told is, you may use this evidence only for the limited purpose of determining whether the government has proved beyond a reasonable doubt that the particular defendant at issue intended to possess the narcotics charged in this case knowingly and on purpose and not by mistake or by accident. That's only about knowledge. It has nothing to do with the intent theory that you're relying on now, which leaves me thinking, well, then what the jury was allowed to do with the evidence, in fact what the jury was told to do with the evidence, has nothing to do with the permissible purpose for which it was admitted. That particular instruction was not objected to, and I would note that it does actually refer to intent because it's about the defendant's intent to possess the narcotics charged at issue. But that's intent to possess, which doesn't have to do with the intent that you're talking about, which is the intent vis-a-vis redistribution. And as to objection, they've objected to the evidence, period. So then the limiting instruction comes along, and I guess you could say, well, we repeat our objection to the introduction of the evidence at all. But maybe they have to do that, but it seems like it's asking a lot to say, well, on the hypothetical that you don't want to engage in, which is that the evidence comes in, then you then have to object to the way in which the evidence comes in. Maybe that's required, but it seems to be asking a lot. They could object to the form of the instruction as well. But the defendants here weren't – well, Mr. Burnett was charged with intent, but Mr. Jesse Young was not. Was not charged with? Was not charged with possession with – I'm sorry. Was not charged with possession with intent to distribute. He was charged with conspiracy to distribute or to possess with intent to distribute. Right. And so to the extent that there was any possible error in the district court's initial jury instruction saying you can use this to determine whether or not they possessed the drugs knowingly. Well, they weren't charged with possessing the drugs knowingly, so they weren't instructed to do something that would result in them being convicted for something they shouldn't be convicted for. Then they weren't told what to do with the evidence. That was the very imprint that you were saying the evidence was needed for, was to show that Jesse knew where to get drugs, he knew the quantities in which it would be distributed, that those were the kinds of facts. But actually, and I think the final jury instruction that the judge gives to the jury before they go out talks about conspiracy to distribute and possess with intent. I guess the other defendants possessed with intent to distribute. Conspiracy too. I'm on JA term 30, but I still need your help in seeing how a prior that is not a conspiracy helps to show a conspiratorial intent. This court doesn't require exact symmetry between the prior conviction and the current charge in order to find that it's relevant to show knowledge and intent. There is a lot more symmetry than simply, this was a conspiracy and the prior was something else. This was a conspiracy to do that substantive offense for which he had previously been convicted. Of course, the question of conspiracy is, did they agree to do the thing to commit that substantive crime? It's an inchoate version of the substantive crime. I think that very much does go to intent, particularly in conspiracy, the sole question is intent. Whether or not there was an agreement, whether or not they intended to do this together. If anything, it is more important in a conspiracy case to have relevant intent evidence. In fact, the Seventh Circuit on Vaughn's decision in Gomez made that point, that in conspiracy cases,  defendant. The idea that if he, if Jesse has previously possessed with intent to distribute, which is all we know from the prior, right? When I think about conspiracy, all we know from the prior is that he possessed with intent to distribute. If that evidence is introduced, then it bolsters the government's case that when he distributes to McDuffie and Baxton, that he's more likely to understand that then they're possessing with intent to distribute. And then therefore the conspiracy would charge, which goes to whether they possessed, there was an agreement for them to possess with intent to distribute, is more likely to be within the mindset of Jesse. That's correct. And perhaps it could have been better parsed out like that in the original, in the initial jury instruction, as opposed to the latter jury instruction, which at the latter jury instruction before the jury deliberated, did say that it was relevant to show that he committed the conspiracy towards that, to distribute and possess, to distribute one kilogram. But perhaps it's. I'm sorry, where was that? That was at 1029 and 1030. So this is, and I honestly don't know the answer to this question. So this is, I'm asking you with the hope that you can be helpful, which is that if we're in this situation as a result of Linares and Pettigrew and all these cases where we're talking about particular theories under which the evidence is relevant, because other theories are foreclosed by the logic of Linares, let's just suppose that that's where we are. Then what do we do with the situation in which the instruction isn't, even the latter instruction that you just pointed to, isn't tethered to any particular theory. It's kind of a blank on all purpose. Consider it for intent. And consider it for intent and knowledge, and don't consider it for propensity. Is the law just that as long as there's some particular sub intent as to which the evidence is relevant, that it's fine for the jury to get a general intent and knowledge instruction that's not tied to the particular theory? I think if we're in the world of, let's look at the particulars of this case, then the question is whether or not the district court abuses discretion. And that's why there's a deferential standard of review. Because, of course, it's easy to sit back months later or years later after the case and say, well, that precise instruction wasn't precisely the theory that ended up coming through a closing argument. But that's why the standard of review is abuse of discretion. Did the district court abuse your discretion in allowing this evidence in, allowing it in in a limited manner and instructing the jury as such? And I think you can see that over the course of the trial, the judge's instruction became more specific as the evidence came in and the theory under which the evidence was being admitted became more clear. Because, of course, it always becomes more clear over the course of the trial. I think I agree with a lot of what you said, but I'm not sure the theory became more specific than anything. It seems like it became more general because at the outset it was just, as I read it, it was basically, you know, knowledge and maybe a slight part of intent. But it was really about make sure that the possession wasn't, was on purpose and not by mistake or accident. That has nothing to do with the theory under which ultimately, in your view, the evidence was germane. It just had nothing to do with it. I don't believe it had nothing to do with it. There are parts to this, many pieces to the puzzle that the government has to put together. One is, of course, that Saxon and McTuffy were possessing the drugs with intent to distribute it. They were charged with that, but then, of course, Saxon did possess some of the drugs in question. And then, in fact, they agreed with Jesse and with Jerry that they were going to be distributing those drugs. And so, of course, the central question for Jesse was, did he intend to join the conspiracy? But a related question is, were his co-conspirators possessing these drugs with the intent to distribute them? Because that's what he's charged with, agreeing with them that they were going to distribute those drugs. And so her instruction wasn't precise as to every aspect of which it may come in, but it did come in with respect to something that was important, which was the drugs, for example, in the back of Saxon's rental car, was he possessing them with intent to distribute them? Which is, of course, very relevant to the question of whether or not he agreed with Jesse and with Jerry that they would all get together and distribute drugs. And so— That seems right as to Saxon. It definitely—I guess the question is as to Jesse, and I get it. I think you're making the point that this was an instruction that was an all-purpose instruction that wasn't tethered to one particular individual. That's correct. And in closing, instead of having a single instruction for all of the defendants, the court had instructions that were specific to the defendants. And I think that was an important clarification. But that doesn't mean that the district court abused her discretion in earlier on in the case when the evidence was coming in, having a very short instruction saying, consider this for a limited purpose, and perhaps not calling too much attention to the evidence as it was coming in. Okay. Why don't we hear a rebuttal? Thank you. I used up my rebuttal time, actually. We'll give you two minutes. We'll give you two minutes for this one, or more if needed. With regard to Lenoris, I indicated earlier that I believe that it tended to focus on distinguishing the possession and constructive possession elements that exist in the places where intent and knowledge occasionally overlap and where they differ, but I didn't see Lenoris as being in conflict specifically because of those distinctions. But the theory of Lenoris, if read broadly, as some of the questions have indicated, could render it inconsistent, it seems to me, with Crowder. That's why I think Douglas put Note 9 and 598, and then Pettyford, Judge Trinvasan, when read one part of it, there's another part of it that distinguishes Lenoris on the ground, that Lenoris was a possession case and this Pettyford was not a pure possession case. And so we're left with these factual distinctions. That's why I asked the question. I think the theories of these cases are frankly inconsistent. I just put my cards on the table. The court has drawn factual distinctions to say possessions on one side of the line, quid, conspiracy to quid, specific intent crimes, what have you, other side of the line. Am I wrong in thinking those factual distinctions have been drawn by Douglas and Pettyford? I guess reading them all together, I can see where the court is concerned. When I read them, I thought that Lenoris just applied the theory to other fact patterns, and I thought that was the point of Lenoris, and I didn't see it to be in direct conflict when I reviewed it. Are there cases that you're aware of, court of appeals cases, that have said evidence like this, a prior distribution, drug distribution offense, can't come in because the current offense is a conspiracy to engage in drug distribution? Cannot come in? Yeah. I don't think I've seen that rule as a blanket rule. Have you seen it at all, anywhere, ever? I can't think right now of a case where it didn't come in for that reason. I think it still has to be relevant to a material issue in the case, and it becomes a little more difficult to be relevant to a material issue in the case sometimes if it is a quid as it relates to a conspiracy or a distribution as it relates to a quid. Have you seen cases drawing that line? I have not seen that line. And the last question, I have standard of review, which the government emphasized, so I suppose one district judge could take a broader view of Lenoris, one district judge could take a narrower view of Lenoris, and we should affirm both. If we're really serious, which, you know, that's a good question, are we really serious about the standard of review of use of discretion? I'm not sure that actually is the right standard of review for this kind of question, but it's what our case has said. Isn't that what the upshot is, is that the district court gets some gray area in which to operate? What kind of reading to take of Lenoris? I would think that the district court under the abuse, if that is the correct standard then, would have some leeway, but I would submit in this case, because the proffered evidence was so weakly relevant to any material issue that whatever standard of use of discretion or whatever the lines drawn in Lenoris or Crowder or the others, that this still falls on the side of inadmissibility on the 404B analysis and then particularly on the 403 analysis. I have one follow-up question to something Judge Kavanaugh suggested. He asked about the distinction between conspiratorial intent and other intent. Is there any case that draws that distinction? If you go one level broader, is there any case that applies a Lenoris-like logic to a circumstance that involves a specific intent crime at all? Do you know of any case that says that in a specific intent situation where Rule 404B specifically has the word intent as a basis for evidence to come in, that we're not going to admit the evidence on a Lenoris epithet? I didn't immediately come up with one, but I just wanted to know. Is it Miller or, I mean, on our circuit? Yeah. I'm not sure, you know, Lenoris is quite specific, you know, and I'd have to think about cases that might be similar in terms of the kinds of factual distinctions I've been drawing where you have a series of distributions, you have a series of hand-to-hands, you have those kind of facts. I would think that the Lenoris approach applies in those kind of settings for the same reason, but I can't think of a case as I speak. Okay. Appreciate it. Thank you. Thank you. We'll turn to the motion to suppress issue. Good morning, Your Honors. I'm Vincent Jankowski representing Faxton Young, Jr. I've been appointed by this Court, and I wish to take the opportunity at this time to thank the Court for the appointment. Your Honor, I'm asking the Court to reverse Mr. Young's, Mr. Faxton Young's conviction because of the illegal search and seizure on Interstate 95, resulting in seizure of evidence which was essential to the government's prosecution of this case. The government contended, and the district court accepted, two bases for holding a traffic stop was lawful. One, the pattern of activity that they alleged was previously exhibited, and secondly, the alleged traffic stop. I respectfully submit to the Court that there was no pattern and there was no traffic violation. There was definitely a pattern. There are trips where they travel to the house, leave the phone, drive up 95. We've got three trips like that. Your Honor, the evidence that was in the possession of the government at the time of the seizure, I think in the government's brief they kind of conflate the evidence that was presented at trial versus what was known to the government at the time of the stop, and it's the latter that's important. Right. The government didn't have the text messages from Faxton to Jesse because those were seized from Faxton's phone subsequent to the stop. But I think, Mr. Giannopoulos, what the government did have was trips going up to Columbia, then Faxton and Jesse traveling north, stopping for about an hour and a half, turning around, and then sailing within D.C. to confidential informant within a few days thereafter, GPS tracking to Jeffy's address, and on-the-ground surveillance of this last transaction in Philly. It seems like not a lot of information. I don't think the government had all that information. What they had, and it's important to parse out what they knew on January 21st and what they know today, what was introduced at trial. At the time of the stop, they knew that on three different occasions, Mr. Duffy's phone and his vehicle both traveled to essentially within a quarter of a mile of Faxton Young's residence in Columbia, Maryland. All right. The GPS is simply not that exact to determine. It's pure spin when they say they went to Faxton Young's address. He went within a quarter of a mile of Faxton Young's address, and there's no evidence that on those three occasions he's even stopped at the same place. All right. Then, so they know that they go to some location. Duffy and his vehicle and his phone go to some location in Columbia, Maryland. The vehicle stays stationary. The phone travels up Interstate 95 to the New Jersey Turnpike, which is important, to New York. Now, the significant thing here, at the time they had a GPS tracker on Faxton's vehicle, too. Faxton's vehicle doesn't go to New York. There is no evidence of what happened to Faxton's vehicle, but it doesn't go to New York. All right. So it's just McDuffie's phone that goes to New York. And it goes to some unspecified location in the Bronx, New York. At the time, they didn't know about Nick's Pizzeria. That came after they arrested and flipped McDuffie. So, really, that's what they did. But they have the sales afterwards, right? Two, three, sometimes five days later, there's a sale. Without the sales, obviously. Yeah, the sales are there. They take these trips, come back, and then there's the sales to the confidential informant. It's not like it's the next day or two days. I mean, I think it's pretty thin to say that McDuffie's getting his drugs in New York to begin with because it's not like it's the next day, right? It's a few days later sometimes. I think in one case it was like a week later. Or more. One of the questions, though, is why is the government putting the resources into having agents on the ground in Philly look at these guys? It's because they really do believe that this is a pattern of drug trafficking. The question is whether or not their suspicion is reasonable enough to warrant the traffic stop. And I submit that it's not. So we have these three times where McDuffie's phone travels to New York. We don't know his mode of transportation. We have taken a bulk bus up there for all we know. Then on January 21st. But I'm not sure that undercuts the government's theory. They know traveling, short stop, return, sometime after sale of drugs. Traveling north, short stop, turn around, back in D.C., some days later, selling drugs. Traveling north, short stop, turn around, come back, some days later, selling drugs. And then when they go up, they're concerned enough that they're looking at what's going on in Philly, and then they stop them. Well, what happens is then, I mean, even if there's a pattern, and a pattern that's indicative of selling drugs, even if, given that there's a pattern that far, on January 21st, the pattern breaks down. Because they didn't go to New York. They take the left fork of the road and take up 95th Street, Judge Kavanaugh's spot. He knows that's the fork that your guy always talks about, right? I'm just glad somebody else knows what I was talking about when I wrote that. But, you know, the pattern then breaks down. I mean, they don't go to New York. They go to Philadelphia. And it's like, these guys aren't going to New York. I can just see the agents thinking, okay, they're going to New York, going to New York. They're not going to New York. And they're in Philadelphia. So if New York's the source city, and if Jesse's the source, they're not going to the source. They're going to Philadelphia. So then they do surveillance in Philadelphia. They see nothing suspicious in Philadelphia. They don't see Jesse in Philadelphia. And then they, so there's nothing to enhance their belief that this is suspicious. Although it's a quick turnaround, right? You don't usually drive to Philadelphia for a meal. But people do things in Philadelphia that are a quick turnaround. It's not that far. You can go shopping in Philadelphia, meet somebody in Philadelphia, have lunch in Philadelphia, do something in Philadelphia. A lot of innocent travelers go from here to Philadelphia and don't stay the night. They stay a few hours. The surveillance didn't show anything suspicious. So then, so even that there was no pattern, there was nothing to suggest that, number one, Faxton even went to New York on those previous occasions. And there was nothing to suggest that in Philadelphia there was anything sinister going on. Unless you're going to stop Mr. McDuffie and anybody who's traveling with him anytime they go north. And that's a real stretch. I mean, anytime McDuffie goes north, if you can pull him over in the car, then, you know, then if you're riding with Mr. McDuffie, then you're subject to a search. And I think that's just too broad a thing for the Fourth Amendment to count as. Okay. Juan, we'll give you two minutes for rebuttal and we'll hear from the government. Okay. Can I just? Yes. I'm sorry. I just wanted to go over on the traffic stop, the other ground for the government. I think we've got the video there. And you can see as the Nissan Road, which McDuffie and Mr. Faxton Young were in, they were following the car. The car in front speeds up. And then the car that McDuffie was driving also speeds up. Okay. And then the car in front slows down. You see that. And then there's what the engineers call perception reaction time. You don't immediately respond to a stimulus. It takes a little time for your brain to process this is happening, this car is slowing down in front of me, I need to do something. And in that less than a second, the officer pulls him up and says, he's following me too close. Everyone on 95 drives like that. That's your point. All right. And I just, well, unless the court wishes to hear about the further delay of the, once the traffic stop was commenced, does the court wish to hear from the government? Why don't we hear from the government and then we'll ask you on the floor. Mr. Jankowski, did Faxton Young join Jesse Young's 440 argument? I do, yes. Thank you. Faxton's argument presupposes that this was a normal traffic stop. But it wasn't, of course. His rental car was stopped because based on the DEA investigation, there was probable cause to believe that there were drugs in the car. But even if you find that the evidence didn't amount to probable cause, it certainly amounted to reasonable suspicion to pull the car over and then request a canine, who then alerted to the presence of narcotics, creating probable cause to search the car. If we thought there weren't independently probable cause based on the pattern, how could a reasonable suspicion give rise to bringing drugs in the same dog? Is that the reasonable suspicion was that he was following too close? Sorry, the reasonable suspicion is based on what? So the district court here found that the DEA investigation created probable cause to pull the car over and search it. But it's not probable cause. Then you're saying reasonable suspicion regarding drugs. That's right. So there was that even if the amount of evidence that the DEA had wasn't enough to meet the probable cause standard, it was certainly enough to meet the lower reasonable suspicion standard. And under the court's case law, reasonable suspicion of drug activity is sufficient to warrant pulling the car over and then calling a canine in order to dismiss the car to determine then whether there's probable cause to search the car. So are you saying that the reasonable suspicion for the canine existed regardless of the grounds for the stop? In other words, suppose that the grounds for the stop are tailing. That's correct. And then would you say that at that point, it didn't matter what happened in the exchange between the officer and the individuals in the car, the fact that they gave answers that the officer thought were somehow suspicion-raising. That's correct. None of that mattered because of what was already in the case vis-à-vis the DEA, that the officer could have pulled the car over based on tailing and then said, oh, canine. I disagree that it didn't matter. It did matter in the sense that it added to the suspicion. Sure. What I'm saying is on your theory, you didn't need it. In other words, your theory is that regardless of whatever happened with the exchange between the officers and the individuals in the car, the officer could have pulled the car over based on tailing and then immediately ordered a canine. The officer could have also pulled the car over based on reasonable suspicion. So reasonable suspicion allowed the officer could have pulled the car over for one of three reasons. Not reasonable suspicion vis-à-vis tailing, but reasonable suspicion vis-à-vis drugs. That's correct. So one, probable cause to believe that there were drugs in the car from the DEA investigation. Two, reasonable suspicion from the DEA investigation that there were drugs in the car. Right. Or three, reasonable suspicion to believe that a traffic violation had occurred. Right. And my point is simply that if you base it on the first order of reasonable suspicion as you itemize them, then nothing that happens in the car matters vis-à-vis the canine sniff. It's not necessary. Yeah. It's not necessary. It's not necessary because at that point the officer could have called the canine. Of course, there was additional indicia of illegal activity when he pulled them over. As soon as he pulled them over, it appeared that they were trying to get their story straight. McDuffie was the leader. Even though the rental car was in Faxton's name, McDuffie was driving it. And when officers then directed his questions to Faxton, McDuffie answered. And then also, as Judge Kavanaugh had pointed out, they had just come back from Philadelphia and now, of course, Troopers Inn did not know at that time that they hadn't been there very long, but he did know that they were still very close to Philadelphia. And they couldn't answer why they had been in Philadelphia or what they were doing there. Now, it may be that that information, even if you think that information itself was enough to provide reasonable suspicion, that information along with the information that had been provided by the DEA to Troopers Inn, that is, the DEA had an investigation and they believed that there were drugs in the car, that was certainly sufficient for the Trooper to call the drug-sniffing dog. Okay. If the Court has no further questions. Thank you. If the ‑‑ it has the government says there was reasonable, articulable suspicion to stop the vehicle just based on what I submit as a very tenuous evidence of drug dealing, then there's a whole lot of people that are going to be stopped on Interstate 95, a whole lot of innocent travelers are going to be pulled over. Now, certainly the officer didn't think, and I don't think the DEA agents thought, they had reasonable, articulable suspicion. Otherwise, they would have told the Maryland State Trooper, stop this guy, get a drug dog, and, you know, search the car. They have an explanation for that. But their explanation was that they weren't sure there was going to be drugs there. Well, you're never sure when you have probable cause. It shows that they had ‑‑ And you're not even half sure when you're in probable cause. I think they were far less than half sure. They had some ‑‑ they themselves were concerned that they didn't have reasonable, articulable suspicion. I mean, they could have stopped them in Philadelphia. They were there in Philadelphia. But it makes sense that if they have suspicion or cause but not certainty, and they have enough suspicion or cause that they value the ongoing investigation, that they don't want to jeopardize it until they want cover, because then they will have become as empty-handed as this time. We still want to be able to follow these guys. So, that makes sense. But that rationale is believable, what the officer said. The officer said, develop your own probable cause. The DEA agents told him, develop your ‑‑ And then what Trooper did, Zinn did, he did what the DEA agents told him to do, but what Rodriguez says he shouldn't do, and that is when he was talking to them at the window of their car, he was asking them questions, the purpose of which was to develop information from which he could then call the drug dog. So, at least in his own mind, and in the DEA agent's own mind, they didn't have enough at that point. Well, they might have worried about how a subsequent reviewing court would look at what they did and get as many alternative bases as they could to prevent the drugs from being suppressed. And, well, they should have been worried, because I don't think ‑‑ what they did was ‑‑ I cited in my reply brief the Charles Williams case in the Fourth Circuit. That's about as close to the case as you can get to this one. There's ‑‑ the troopers had very ‑‑ they had, in that case, they had legitimate grounds for a traffic stop. And then the officer, again, did what the Supreme Court said they shouldn't do. He tried to develop that. He used the stop, the lawful stop, to investigate drug trafficking, which the Supreme Court says you can't do. So, just the fact ‑‑ and they made up some reason as to why they didn't. But the prosecution says here, well, you can do that if you also have reasonable suspicion on the drug. If that distinguishes it from the drug. If you have reasonable articulable suspicion. But given what they had, as I say, there's a whole lot of innocent travelers that could be pulled over on the road based on this kind of very, very thick. And if they did that, if that was the case, if they had reasonable articulable suspicion to at least detain them pending the arrival of the drug dog, they would have called the drug dog right away. They would have, once they pulled over, you should have called the drug dog. Because in his mind, if in his mind he had reasonable articulable suspicion, he can call for the dog and hold him there until the dog gets there. So, at least the officer didn't think he had anything there. And I don't think the DEA agents thought that he had anything there. And I think that's because they didn't have anything there. Okay. Why don't you turn, are you staying up? I don't know if you have to go back and retrieve things for the destruction of evidence issue. On this issue, your honors, the government did a very good job of explaining what happened to the drugs that were seized on this traffic stop. What they didn't do so well were explaining what steps were in place to make sure it didn't happen. As the proponent of the drug dog, the government has the burden of showing its invisibility. The government can't shift that burden to the defendant because they lost the evidence. Part of that showing, part of the showing of invisibility that the government should have to do when the evidence doesn't exist and they're trying to rely on secondary evidence, is that there are policies and procedures in place to make sure it doesn't happen so that they've shown their good faith. Can I ask this question? If we, just bear with me on this as an argument. If, arguendo, we think that bad faith is required, do you have an argument as to bad faith? Or is your argument that there's not a predicate requirement for bad faith? In this circumstance, there's not a predicate requirement of bad faith. And what distinguishes this case from McKee and some of the other cases is, truly in McKee, there was, I mean, apparently the drugs were lost somewhere in transit. And, you know, it was inadvertent, it was truly inadvertent. Here, the drugs were intentionally destroyed. And mistakenly, let's be sure, but they were mistakenly destroyed. And the difference is that in this case, having policies and procedures in place would have prevented it from happening. That's why I think the government has to show good faith. I can't find a case in which the government failed to show that it had policies and procedures in place, and on that basis, the sanction was that, there was some defect in the conviction on that ground. It seems like this Henriquez case in the Second Circuit is the closest, and even there, they admonish, they should have policies, but I'm not sure what flows from your theory, even if we accept it. Well, first of all, since Henriquez, the government is on notice that they should have policies and procedures in place to make sure this kind of thing doesn't happen. I mean, the government said it was a mistake, but that's the beginning of the inquiry, not the end of it. The important inquiry is what was the mistake and what was done to make sure it should not have happened. That is, I think, what distinguishes this case from the case decided by the government. The state of the evidence in this case is that there is neither good faith nor bad faith. There is just faith, faith that maybe we won't need these drugs anymore. Okay, so let's get rid of them and hope we don't need them anymore. But that's not enough. If the government wants to introduce secondary evidence, having lost the evidence themselves, then they have to have something in place to satisfy their burden under Room 101 for the invisibility of the evidence. And they didn't do that in this case. They just showed that the Maryland State Police certainly followed their procedures in destruction of evidence. But that kind of begs the question. The question is, why was the Maryland State Police allowed to do that? And it was because the federal government didn't do anything to assure, or because of the preservation of evidence in a federal prosecution. And that, I think... But doesn't McKee explain how the 901 factors are met or not? Well, McKee... And I know that the case went to get faith or not, but... McKee kind of brushes over. The court, it says in the last footnote there, it says they're kind of troubled by the... I mean, you don't use the word cavalier attitude, but they say something about they're troubled by the cursory approach that the government has taken to this, and so forth and so on. And, of course, that happened in the middle of trial. Here we're having what is essentially the government's burden and the government's motion to introduce this evidence. So we have plenty of time for development of the record. And it's a record that is solely in the possession of the government. So the government should have to produce it. And it was not done in this case. And it was in court and evidence for two reasons. Number one, it was the only drug evidence that was introduced against these appellants in a drug case. That's number one. And number two... Judge Pallotta, you look like you're going to ask a question. No, I was just going to say that in terms of 901 and authentication, what I'm thinking about in McKee is that they talk about... The court talks about the drugs having been available for testing before trial. The government had established a chain of custody so that we knew the drugs that were tested were the drugs that were found in the defense system. The chemist was available for cross-examination. So when you're looking at 901, you're talking about authentication. It just seems like that... It's not like these were lost before they were tested and examined and then there was an opportunity for the defendants to cross-examine the chemist. Well, cross-examining the chemist, unless you have your own chemist to facilitate that, is difficult. Unless you're a chemist yourself, that's going to be difficult. Here the drugs were destroyed much earlier in the proceedings when further testing could have been done, when other things could have been developed. I mean, McKee was in the middle of trial and it's like, you've got the chemist, you've got the analysis, we just don't have the drugs, what do we do about it? I think the government certainly has the opportunity to present the evidence in this case. The second thing that I want to bring about, about the importance of the evidence, it's not just the character of the drug that is heroin, but it's also the purity. Because if you've got a small amount of heroin, if it's a high concentration, it suggests that that small amount of heroin could be diluted and broken down for further sale. If you have a small amount of heroin, if it's already been diluted, if it's a low purity, then that is more probative of personal use because you can't cut it down anymore, otherwise it loses its narcotic effect. So I think for these reasons, unless the Court has any further questions, I think I'd like to reserve... Okay, we'll give you a minute for rebuttal on this issue. Thank you. We'll hear from the government. Courts routinely admit secondary evidence even when the primary evidence has been destroyed. In California v. Trombetta, the Supreme Court allowed breast laser results to be admitted even though the breast samples themselves had been destroyed, saying that, quote, California's policy of not preserving breast samples is without constitutional defects. Whatever the duty the Constitution imposes on the state to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. And, of course, the evidence here would not have been expected to play a significant role in the suspect's defense because, as the District Court noted, it strains imagination to appreciate or understand how the heroin could be exculpatory. As for the defendant's 901 argument, which was raised for the first time in their reply brief, as for the chain of custody, in fact, the chain of custody was admitted at trial. That was Exhibit 601, which I apologize is not the appendix, along with the lab results and the technician, and that lab technician was, in fact, available for cross-examination. Moreover, in addition to the test of the heroin, there was also available for the defendant the second package of heroin that was subsequently found in the shoes that had been retrieved from the car. So as to opposing counsel's argument about the purity of the heroin, there was some amount of heroin available for them to test had they wished to do so, just not the large 61-gram block that was discovered. But as the Court points out, this Court and the Supreme Court has required that when sanctioning the government for loss of evidence, you have to show both that the evidence was exculpatory and also that there is bad faith on the part of the government. And the defendants do not attempt to show bad faith here, as there wasn't, and the district court properly found that the destruction was inadvertent. No further questions? Thank you. A minute for rebuttal. Just briefly, Your Honor, Trombetta is distinguishable because these defendants, the defendants in Trombetta, rather, were not charged with conspiracy to possess a breathalyzer. They were charged with conspiracy to possess heroin, and it was the heroin that was lost. The breathalyzer in Trombetta was evidence of the offense, but it wasn't the substance of the offense itself. Secondly, my Rule 901 argument, that was raised in response to the government's brief, and I submit it was a proper reply, that the government said it was the defendants' burden to show bad faith. I submit it is the government's burden under Rule 901, as the proponent of the evidence, as it is with every proponent of the evidence, to present whatever facts are necessary to get that evidence in, and when they seek to put in secondary evidence, having destroyed the primary evidence, they have to show some kind of good faith procedures that are in place to make sure that that doesn't happen. Thank you. No further questions? We'll turn to the first sentencing issue. Mr. Katzoff. Thank you. The first sentencing issue, which I raised on behalf of Jesse Young, and I'm reasonably certain both appellants, Burnett and Faxenium, joined in, involves the district court's determination of the relevant drug quantities. From review of the record, Mr. Young argues that the court improperly double-counted 130 grand in calculating its drug quantity and offense level. The court ended up coming up with a calculation of 995.7 grand that included two 130 grand transactions or trips to New York, and I have argued and pointed to the parts of the record that I submit support the indication that that is a reference to one specific trip. I believe it was referred to a second trip on one occasion and a third trip, and there was some confusion because Mr. McDuffie said no drugs were obtained on the first trip, and then he had a 50 grand for the second trip and 130 grand for the third trip, and then later on I believe he referred to 130 grand as the second trip, logically meaning the second trip where drugs were obtained. There's no place in the record that I saw anywhere else where there was a second trip. So if you get the benefit of that 130, that still keeps everyone in the bandwidth? Yeah. We don't get anything or we don't get much. We don't get enough. But I also argued that there is another problematic calculation that the district court made that is clearly erroneous, and that is the court found that there was a 400 grand quantity in either November or December that couldn't be determined that what was obtained on one of those trips where Mr. McDuffie didn't testify about any specific quantities being obtained in those trips. But he referred to 400 on one of them. Yeah. He referred to 400 one time. Yeah. He referred to it in the context of being asked what's the most, basically being asked for an estimate, and he said 200, and then after a follow-up question was objected to, the court asked a follow-up question in which he said the singular word, I believe, 400. And then he was asked probably four or five times after that, and every time he either recanted, said he wasn't sure, said he couldn't say, said that those are the numbers. There is a hook. I guess my problem here for you is the preponderance standard the district court applies combined with the clearly erroneous standard that we have to apply as a problem, because there is a hook, right? It's not like it came out of thin air. There's a hook in that. There is absolutely a hook. There is a reason that you could go to the transcript, but I would submit that when you look at the totality of the testimony of McDuffie, it doesn't rise to the level of preponderance of the evidence, and it is clearly erroneous. The totality of his testimony is he wasn't a heroin dealer, really. He was a marijuana and cocaine dealer. Between September 2011 and January 2012, he sold to his only customer, other than some drugs that he claims he left at Jerry Burnett's, I believe, was the confidential informant, his only heroin customer. Between September and January, he sold approximately 75 to 80 grams total during that time. And so when you look at the number of times he said, I'm not really sure. I don't really know. I can't really say that. This just doesn't seem right. What about the idea that the district court here made a conservative estimate on a lot of these things, excluded Detroit, went to the low end of certain of the transactions, and this is rough justice, which is why the Supreme Court had a problem at one point with this system, but that's the way it works. Well, I would submit that Detroit, for example, just never rose to the level and the court found that it did rise. But the district court is carefully going through it in the sense that the government is pushing for the 3K. You're pushing, I think, for 174, if I'm right. 100 to 400, I think, would be adopted with the pre-sentence. The district court goes through the transactions and is a low end on some. I can't criticize the court's effort to look at the record to make those findings, and I can't say there wasn't that little hook, but I strongly contend and submit to the court that that 400 was a fiction in the totality of the testimony, not supported by preponderance, not supported by clearly erroneous, and it's really hard to tell exactly whether the judge undertook rough justice in that fashion. But what we have for a record, I submit supports a finding that it was not a preponderance sentence and it was clearly erroneous. Okay. We'll give you a minute for rebuttal and we'll hear from the government now. The district court did not clearly err in finding that there were at least 700 grams involved in the conspiracy. Of course, that's the amount that we need in order to get into the correct guidelines calculation. Even leaving aside the 130-gram trip in July, and of course, there was record evidence to support that. The judge referred to pages 849 and 850 of the record. The defense also has to establish that the 400 grams… Do you think that was correct, though? Do you, sitting there now, standing there now, think that's correct, or do you think there was a double-counting issue there? I think there's evidence to support it, but I think it is one of the defendants' stronger arguments that it may have been double-counted. But, of course, it doesn't matter because, as Your Honor pointed out, the judge was very conservative in her estimate, and even if you entirely discount the 130-gram trip in July, you could just knock that trip down to 50 grams, which was, as Ms. Duffy testified, the least amount they ever obtained on a trip. And you did testify there was a trip in July, and there were rental car records for July. So you could knock that 130 down to 50. But even if you completely knock out the 130 grams, in order to get down below 700 grams, defendants have to show that no 400-gram trip ever took place. And it was not once but twice that Mr. McDuffie testified that he obtained 400 grams. He testified on page 851 of the joint appendix. He was having some difficulty answering questions, and the judge asked him point-blank, what is the most you ever received? And he said clearly, 400. He reiterated that testimony on page 882 when he said he got 400 one time, 250 another time, and otherwise less. Now then, on page 945, he does step back a little bit from that 400-gram testimony, and he says, well, maybe it was 250. But even if you knock that 400 grams down to 250 and completely ignore the 130-gram trip in July, it's still over 700 grams, and therefore the district court did not clearly err. Do we have no further questions? Okay, thank you. Any rebuttal on that? Your Honor, I think the court understands the issues, and I think they're all presented in the briefs. Okay, thank you. We'll hear argument now from Ms. Davis on the second sentencing issue. Good morning, Your Honors. The issue I will be addressing is whether Mr. Burnett is entitled to resentencing because at the time of your sentence, the court included transactions that took place prior to when he joined the conspiracy. I think the guidelines are very clear according to 1B1.3 that relevant conduct is not to be included for amounts or conduct prior to when one joins the conspiracy. Now, the government agrees that if you take the amount that the district court judge determined, which was 995.7, and take away the amount that took place prior to him joining the conspiracy, the correct amount would be 685 grams, which gets us below the 700-gram cutoff. But then the government turns around and says, well, we can include other amounts, and they include 35 grams that was found in his residence at the time of the search. But there's no evidence that those 35 grams were different from the other amounts that were already included by the district court. Your theory is that those came from one of the transactions. Exactly. There's no testimony, there's nothing in the record that there were any other transactions that Burnett got drugged from anyone else other than the people in the conspiracy. So it would be improper to count the 35 grams because that would be double counting. The government also argues, and I think Judge Kavanaugh brought this up, that the court is being conservative. But I think the court had to be conservative based on the testimony in this case. Mr. McDuffie testified, I think this was a joint sentence, 1034-35, when asked how many drugs, how much was involved in the conspiracy, he said not three, not two, maybe one, maybe a bit more, maybe a bit less. And that's for the entire conspiracy. So if you take away, if you start counting when Burnett joined the conspiracy, then you're way below the one kilogram. The government also argues that, well, he got the 151 sentence, 151 month sentence, and so therefore you can't really show that there was any prejudice to Mr. Burnett. But in this case, the government asked for and the judge sentenced Mr. Burnett to the low end of the guideline. And I think that's fair that the judge would do that because his involvement was much less than anyone else. He was not a supplier, as the other defendants were. So therefore, I think he'd be entitled to the lower sentence in order to avoid any sort of disparity. The recent Supreme Court case helped you on that, too. Yes, I believe so. So I think, you know, based on the record as it is, that there's no way that... I was just going to say, isn't there, I mean, under Children's, there's a requirement that the district judge make specific individualized findings about the scope of each appellant's conspiratorial agreement and the evidence that led it to conclude in each of their cases that the appropriate amount of drugs was involved. So there's kind of a process error here as well because the other drugs that the government points to were not added up by the district judge in that way under Children's. Well, I think the district judge did the best she could based on the testimony. And I think that this court has to, not going into the prior argument, I think that this court has to take facts as found by the district court. And the government is asking this court to kind of re-look at everything and re-do the calculations based on the record, but there's nothing in the record to support their recalculation. Okay. Your question, sir? The relief that you want on that is... Excuse me? The relief that you're... That we would want to be resentenced and have the correct guideline level be applied. We also argue that... On resentencing, they could look at the 34 too, right? Excuse me? The district judge could look at the 34 grams as well, no? The district court judge could consider it, but I think we have the same argument. You make a good argument for here, I'm just saying. Yeah, and I think we would make the same argument below. Yeah. Right. And then we also have the argument concerning the Philadelphia trip, that the 61 grams should not be counted because it was not part of this conspiracy that Mr. Burnett was involved in, and he had no knowledge of it. So I think we'd also get rid of the amount of 61 grams. Okay. Thank you. We'll give you a minute for rebuttal. Okay. Thank you. The court did not address the 34 grams found in Mr. Burnett's house in order to find... Let me just stop there. Does that mean you agree with what I say about that would be double counting, or at least we can't be sure on this appellate record that that 34, right, didn't come from the same pattern of activities that we're talking about in the conspiracy? There is evidence of the record that the drugs from the two January trips, which were the most recent trips, were not those 34 grams. That doesn't answer the question, right, which is from all the trips, the 34 in the house could be 34 from one of the trips, correct? It's certainly possible, but we also argue that there are a number of other ways. If it's just on the 34, then do you agree that, because I saw your argument in the brief and I took it seriously, but I don't see how we can do that, to be honest with you. I looked at it and said I don't see how we can possibly add the 34 here. Well, the court didn't explain why she didn't include the 34. She just said she wasn't going to include the 34, and certainly I acknowledge that that is the least likely to be included. I think much more likely to be included on the September and October trips. There was ample evidence in the record that Mr. Burnett was actually specifically involved in heroin from those trips. The September trips, there is evidence in the record that Mr. McDuffie picked the drugs up from Mr. Burnett that he then sold to the CI. But the district judge didn't base any of the calculations on those drug quantities, right? No, she didn't. She relied primarily on Mr. McDuffie's testimony and what he testified as to the trips that he was involved in. The September trips, Mr. McDuffie did not himself take. He testified that Saxton provided him with drugs in September. But there is record evidence that a September trip did take place because there's text messages and rental car records. But we don't know how the district court would have relied on that or not. I mean, this system's already pretty loosey-goosey for a system on which so much depends for how much someone's going to spend in prison. If we start doing fact-finding like this here, it seems even more of a problem. Well, under the plain error standard of review, the court had to find— Well, what about the Supreme Court's recent case on that? Because that seems to really collapse plain error in this context to error. Melina Martinez discusses what happens if the court finds that there was a guidelines error. And, of course, the question that we're addressing first is whether or not the court erred in applying the over-700-gram guidelines calculation to the defendant. So Melina Martinez is not directly on point in the sense that you can determine that the district court did not clearly err in applying that guidelines calculation because, in fact, there was record evidence to support more than 700 grams, even if it wasn't precisely the record evidence that the district court relied on. Well, maybe I'm not understanding Melina Martinez. When a defendant is sentenced under an incorrect guidelines range, which is the argument here, whether or not the defendant's ultimate sentence falls within the correct range, the error itself can and most often will be sufficient to show a reasonable probability of a different outcome absent the error. That's correct. And it's possible to distinguish Melina Martinez on two grounds. First is we're arguing that the guidelines calculation was not incorrect because the district court could have and would have gotten the 700 grams. And then second is from... Am I misreading, children? I thought our district court requires that the district judge to make individual findings with respect to each defendant on the conspiracy of which drugs are attributable. So we can't sort of, as you're pointing out, kind of do the attribution ourselves. Well, we're under plain error standard review at this point. So the court has to determine that the error affected the defendant's substantial right. So that would have been a different result. Why is there plain error when they were arguing? They go in advocating a specific amount. The government comes in advocating a much higher amount. The district court kind of finds its way to the middle. Because they put in specific arguments as to what they think should be attributed to them, and isn't that sufficient to preserve their argument? Not where they have failed to address the factual findings that the district court made. The district court made a series of factual findings. So I should back up. There wasn't a lot of opportunity. I read the transcript. I guess you can always pipe in. But they put out their arguments. The government puts out its arguments. And I agree. You can always jump up and down. Well, and here the district court expressly asked the defendant if they had any objections to the factual findings. But they'd already put in their argument. Of course we think you're wrong because we think it should be 174, right? But they didn't address the particular trips that she had found. Now, as to Mr. Burnett's argument, the argument that you can only consider the amount of time from September or August or September on, of course that argument was not limited to the district court's factual findings, but that is an argument that could have been raised before the district court made her factual findings. That judge, whatever you do, please remember to only count for Mr. Burnett what happened in August or September. And, of course, that would have been a very easy objection to raise in district court as she went through and applied the entire volume to Mr. Burnett. I agree with some of what you just said. Now, I want to make sure I understand your reading of Molina-Martinez, though. Give me that again, your distinction of why. Molina-Martinez presupposes that there is a guidelines error. And, in fact, there was an agreement that the wrong guidelines range was applied. Our argument is clear. What am I missing? I'm missing something clearly because isn't that their argument here? They're saying that the wrong guidelines range was applied. We're saying that even if you agree with their, and we do agree that the court should not have included the summer trip, that it was still the right volume of quantity of drugs that was applied and, therefore, still the right guidelines that was applied. That even if you didn't include the summer trip, Mr. Burnett still had. So Molina-Martinez does not apply to a calculation error? Molina-Martinez said, let's assume there is a calculation. Let's assume that the defendants were sentenced applying the wrong guidelines calculation. And what we're saying is that this isn't necessarily the wrong guidelines calculation because on alternate facts for which there is support in the record, you can still get to the same guidelines calculation. Also, while Molina-Martinez did say in most cases a guidelines error will result in a reversal because it's clear that the sentence would have been something different, it's not true in all cases and the court is allowed to look at the record as a whole to determine whether or not substantial rights were affected. I mean, they specifically give examples of what they're talking about there and the examples are not this case where the district court says, which some of the district judges do, as you well know, say, even if I'm wrong about the guidelines calculation, it's going to be 126 months or whatever. That's correct. And that didn't happen here? No, that did not happen here. Okay. Any other questions? Yes. I'm sorry. There is this question about amending the sentence when the district court had jurisdiction to do that. I guess I'd be interested in your thoughts on how to handle that. So for, I apologize, that has actually been, or already been fixed. The court did remand Mr. Saxton Young's sentence to the district court so that the district court could fix the jurisdictional defect in its amendment of Mr. Young's sentence. So he is now sentenced to 120 months, which is a mandatory known sentence. So as I understand, the sentencing arguments are all rooted for Saxton Young. And that's not an argument that applies to the other sentence. It is not because they did not move in district court for a reduction in their sentence pursuant to Amendment 782. They would be eligible to amend it differently? If the court were to remand, the district court could apply the new sentencing guidelines in resentencing. And I think if Mr. Young had moved for a resentencing and it had been granted, and there are any number of reasons, this is within the district court's discretion to grant it. If it had been granted, his sentence would go down to 120 months, also moving the issues. Jesse Young. Jesse Young. Mr. Burnett, however, he had a two-level bump for obstruction of justice because he testified and perjured himself during trial. And so his sentencing guidelines were higher than his co-defendants. If he were to apply for the same amendment and if it were granted, and again, that's within the court's discretion, his new sentencing guidelines, assuming no difference in the drug quantity, would be 121 to 151 months. So it would not necessarily move his argument. All right. Thank you. Any rebuttal? Seeing none, thank all the defense counsel. You were appointed by the court, and we thank you for your able assistance, both in the briefing and in the oral argument. We appreciate it. The case is submitted.
judges: Kavanaugh, Srinivasan, Pillard